Erwin J. Shustak (SBN 119152)
eshustak@shufirm.com
Katherine S. Bowles (SBN 272704)
kbowles@shufirm.com
Mahdi M. Ibrahim (SBN 276742)
mibrahim@shufirm.com
SHUSTAK REYNOLDS & PARTNERS, P.C.
401 West "A" Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 696-9500
Facsimile:  (800) 868-9350

*Attorneys for Plaintiffs Philip Scott Bradshaw and Michael Wayne Bradshaw*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIP SCOTT BRADSHAW, an individual, and MICHAEL WAYNE BRADSHAW, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INC., a Delaware corporation,<br><br>Defendant. | Case No. **'23CV0133 GPC AGS**<br><br>**COMPLAINT FOR:**<br><br>1. **DECLARATORY JUDGMENT AS TO 18 U.S.C. § 1836**<br>2. **DECLARATORY JUDGMENT AS TO EMPLOYMENT AGREEMENT**<br>3. **DECLARATORY JUDGMENT AS TO CTP-SCA**<br>4. **DECLARATORY JUDGMENT AS TO CTP-RFA** |

1. Plaintiffs Philip Scott Bradshaw ("Philip") and Michael Wayne Bradshaw ("Michael")[1], complain and allege, upon information and belief except as otherwise specifically stated, against Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Defendant" or "Merrill Lynch") as follows:

## THE PARTIES

2. Plaintiff Philip was employed by Merrill Lynch from July 2006 to November 2022 as a FINRA registered investment advisor/representative. Merrill Lynch terminated Philip on November 10, 2022. Philip is a California resident who resides in San Diego County.

3. Plaintiff Michael was employed by Merrill Lynch from August 1974 to January 2023, as a FINRA registered investment advisor/representative. He voluntarily resigned from Merrill Lynch on January 4, 2023. Michael is a California resident who resides in San Diego County.

4. Defendant Merrill Lynch is a Delaware corporation with its principal place of business in New York. Merrill Lynch is a FINRA registered broker-dealer and SEC regulated Registered Investment Advisor firm. It is one of the largest brokerage firms in the country, employing over 14,000 financial analysts and managing $2.3 trillion in client assets.

## JURISDICTION AND VENUE

5. The court has jurisdiction over this matter under 28 U.S.C. § 1331. Plaintiffs' claims for declaratory relief arise, in part, under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., as Plaintiffs seek a declaration that they did not violate the DTSA; that Defendant otherwise has no valid claims against Plaintiffs under that statute; and that Defendant has no basis to obtain temporary injunctive relief, permanent injunctive relief, or other relief against them.

---

[1] Plaintiffs share the same surname. To avoid confusion, this Complaint will refer to Plaintiffs by their first name.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because Defendant actively and regularly conducts business in this district and a substantial portion of the events and/or omissions giving rise to Plaintiffs' claims occurred in this district. Among other things, Plaintiffs Philip and Michael were employed by Defendant in this judicial district and entered into employment agreements with Defendant in this judicial district.

## FACTUAL BACKGROUND

7. Plaintiffs Philip and Michael are experienced financial advisors with over sixty combined years of experience in the financial services industry. Michael began his career at Merrill Lynch in 1974. He is a Certified Financial Planner and holds a Certified Investment Management Analyst certification. In February 2011, Michael was listed as a Barron's top financial advisor in all fifty states. In 2014, Michael was recognized on the Financial Times Top 400 Financial Advisors ranking.

8. Philip is Michael's son who followed in his father's footsteps and began his career with Merrill Lynch in 2006. Philip remained with Merrill Lynch until November 10, 2022, when Merrill Lynch terminated his employment. During his time at Merrill Lynch, Philip worked tirelessly to serve his clients and grow his business.

*Defendant's Agreements are Unenforceable*

### Employment Agreement

9. As part of his employment with Merrill Lynch, Philip signed a Financial Advisor Employment Agreement and Restrictive Covenant ("Employment Agreement"). Attached as Exhibit 1 is a true and correct copy of the Employment Agreement between Merrill Lynch and Philip.

10. Upon information and belief, Michael also signed a Merrill Lynch Employment Agreement in a form substantially similar to Exhibit 1.

11. The Employment Agreement states, "that [Philip] be enjoined and restrained from using or disclosing any information" learned as part of his employment with Merrill Lynch. See Exhibit 1, section 4. Moreover, Philip is "enjoined and

restrained from soliciting any Account whom [he] served or whose name became known to [him] while employed by Merrill Lynch, in any office and in any capacity." *Id.*

12. The Employment Agreement includes a non-solicitation provision that bars Philip for one-year after termination of his employment, without geographical limitation, from:

(a) encouraging or requesting any client to transfer from Merrill Lynch to Philip or to his new employer;

(b) encouraging or requesting any client to open a new account with Philip or with his new employer; or

(c) encouraging or requesting any client to otherwise discontinue its patronage and business relationship with Merrill Lynch.

(See Exhibit 1, Section 2).

13. Upon information and belief, Michael is ostensibly bound by the same restrictive covenants in the Employment Agreement.

**Client Transition Program Agreements**

14. As part of Michael's employment with Merrill Lynch and his planned retirement, he signed a Client Transition Program – Active Senior Consultant Agreement and Release ("CTP-SCA"). As part of Michael's planned retirement, clients he introduced to Merrill Lynch and whom he and his team serviced, would be transitioned to other advisors on that same team under the agreement. Attached as Exhibit 2 is a true and correct copy of the CTP-SCA between Merrill Lynch and Michael.

15. The CTP-SCA imposes several restrictive covenants and unenforceable provisions on Michael about what he can and cannot do after he leaves Merrill Lynch and for another three years. These include:

a. "During the Restricted Period, [Michael] must not contact former clients, directly or indirectly (either independently or in coordination

   with another registered representative, including the Receiving FA/PWA), for the purposes of soliciting them to transfer their accounts from Merrill Lynch, to conduct any securities transactions, or to offer financial advice." See Exhibit 2, page 3.

 b. "During the Restricted Period, [Michael] must not discuss securities transactions (past, present or future) or securities-related matters with former clients either independently or in coordination with another registered representative including the Receiving FA/PWA." See Exhibit 2, page 3.

 c. "During the Restricted Period, [Michael] shall not contact former clients, directly or indirectly (either independently or in coordination with another registered representative, including the Receiving FA/PWA), for the purposes of soliciting them to transfer their accounts from Merrill Lynch, to conduct any securities transactions, or to offer financial advice." See Exhibit 2, page 3.

16. The CTP-SCA further states that for an indefinite period: "[Michael] shall not disclose, copy, use, own, apply for, or otherwise attempt to obtain or use, directly or indirectly… any Confidential Information…." See Exhibit 2, page 4.

17. The CTP-SCA defines "Confidential Information" as "all information regarding the Eligible Households and any other households that [Michael] learned of or serviced during his/her employment with Merrill Lynch (Protected Households) including the Protected Households' identities, addresses, phone numbers, trading practices, strategies or preferences, margin information, purchasing and marketing technique, sales information, correspondence, records, financial information, and all other data, material, and facts pertaining to the Protected Households and related clients and accounts." See Exhibit 2, page 5.

18. The CTP-SCA also includes a "Covenant Not to Compete" provision but, recognizing California law prohibits restraints on employees engaging in a lawful

profession, California based employees like Michael are explicitly exempt from these restrictions.

19. As a member of the team to whom Michael's clients would be transferred under his CTP-SCA, Merrill Lynch required Philip to sign a "Client Transition Program Agreement and Release – Receiving FAs" ("CTP-RFA"). Attached as Exhibit 3 is a true and correct copy of the CTP-RFA between Merrill Lynch and Philip.

20. The CTP-RFA states, "If the Receiving FA terminates employment with Merrill Lynch, either voluntarily or involuntarily, the Receiving FA/PWA shall not, directly or indirectly, solicit financial services business from the Eligible Households (and accounts therein) for a period of five years from the agreement execution date, even if the Receiving FA's/PWA's new employer is a signatory to the Protocol for Broker Recruiting (Protocol)." See Exhibit 3, section IIa.

21. The CTP-RFA also unlawfully prohibits Philip from soliciting the former clients he and his former team serviced, unless he pays Merrill Lynch a significant sum to take/use confidential information (see Exhibit 3, section IIb) which Philip may legally use under California law already.

22. The CTP-RFA also includes a New York choice of law clause, in violation of California Labor Code § 925. See Exhibit 3, section III(C).

23. By including language in the CTP-SCA (entered on or about the same time as CTP-RFA) explicitly excluding anyone that "works or resides in California," Defendant admits that the CTP-RFA restrictions prohibiting Philip from soliciting clients are not valid in California. See Exhibit 2, page 3.

24. The provisions of the Employment Agreement, the CTP-SCA, and CTP-RFA (collectively, "Defendant Agreements") are unlawful under California law and a violation of California's strong, longstanding, and well-settled policy favoring open competition and worker mobility. Specifically, California Business and Professions Code § 16600 prohibits contracts that restrain anyone from engaging in a lawful

profession, trade, or business, and restrictive covenants of this type are unlawful under California public policy.

25. Moreover, section 16600 invalidates provisions that prohibit a worker from competing with a former employer (including non-solicitation provisions) or "imposing a penalty if he does so unless they are necessary to protect the employer's trade secrets." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945-946 (2008) (quoting *Muggill v. Reuben H. Donnelly Corp.,* 62 Cal. 2d 239, 242 (1965)). The CTP-RFA requirement that Philip pay a significant sum for the ability to use information which Philip is already entitled to is an illegal "penalty" since it is unnecessary to protect trade secrets. Merrill Lynch is imposing a void and unenforceable "pay-to-compete" obligation on Philip.

26. Upon information and belief, Merrill Lynch also has similar unlawful non-solicitation provisions in other employment related agreements that purport to divest advisors of compensation they are owed if the advisors solicit clients after leaving the firm. Plaintiffs similarly seek a declaration that these provisions are void and unenforceable, as they similarly violate California law.

**Protocol for Broker Recruiting**

27. Merrill Lynch is a signatory member of the Protocol for Broker Recruiting ("Protocol"). The Protocol is an agreement among participating firms that allows financial advisors who transition from one Protocol member firm to another to take certain client information, including client names, addresses, account titles, email addresses, and phone numbers, with them without the threat of litigation. The transitioning advisor may then use that information to contact clients if the terms of the Protocol have been met.

28. The Protocol was born out of an avalanche of "trade secret" litigation between the largest Wall Street firms, including Morgan Stanley, Smith Barney, Merrill Lynch, and UBS, in the 1990s through the early 2000s. When an advisor would leave one firm to join another, the prior firm would routinely file for a temporary

restraining order or other emergency injunctive relief, claiming, among other things, that the basic client information to which the advisor had access during their employment constituted highly confidential, legally protected trade secrets. Firms would argue the client relationship belonged to the firm and that client contact information was a legally protected "trade secret." In seeking—and routinely obtaining—emergency injunctive relief, the departed firm's goal was to block the advisor's transition to the new firm or, at a minimum, buy time to persuade clients not to move. That same firm, of course, would take the opposite position when recruiting new advisors and encourage them to transition their clients and assets into the firm.

29. Recognizing the growing abundance of actions seeking TRO's and Preliminary Injunctions that then abounded throughout the financial services industry, and to rein in ballooning legal costs and escalating client confusion, Smith Barney, Merrill Lynch, and UBS formed the Protocol in 2004. Morgan Stanley (Smith Barney's ultimate successor) and Wachovia Securities (now Wells Fargo Advisors) followed suit and joined the Protocol in 2006.

30. There are now more than 1,700 Protocol members, including FINRA broker-dealers and SEC and state regulated Registered Investment Advisor firms. Merrill Lynch itself was a Protocol founding member and continues as a signatory to the Broker Protocol.

31. The purpose of the Protocol was for firms to put client needs ahead of their own and allow financial advisors the freedom to move from one firm to another without interference with clients. According to the Protocol, its "principal goal is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RR') between the firms."[2]

---

[2] http://www.thebrokerprotocol.com/index.php/authors/read-the-protocol

32. The Protocol further states: "If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm. . . . The signatories to this protocol agree to implement and adhere to it in good faith."

33. By permitting advisors to take client names, addresses, account titles, email addresses, and phone numbers when they depart the firm, Merrill Lynch admits this information cannot qualify as a trade secret. Merrill Lynch's permitted disclosure of this information invalidates any argument that advisors adequately maintain the secrecy of the information as required by 18 U.S.C. 1839(3)(A).

**Merrill Lynch's History of Legal Actions Against Departing Advisors**

34. In past years, Merrill Lynch has been hostile in its treatment of departing advisors, including advisors who leave under the Broker Protocol. Upon information and belief, Merrill Lynch has suffered considerable departures of high earning advisors, making Merrill Lynch eager to deter the exodus of significant, revenue generating clients.

35. For example, in 2021, Merrill Lynch sued several advisors, including a thirty-two-year veteran of Merrill Lynch, seeking a court order for the return of any contact information the advisors were taking to their new firm, despite Merrill Lynch and the advisors' new firm being members of the Broker Protocol. Merrill Lynch sought "injunctive relief to protect it from the imminent, irreparable, and ongoing harm presented by Defendants' retention of Merrill's confidential and trade secret information and ongoing wrongful solicitation of Merrill clients." Despite acknowledging in its complaint that Merrill Lynch and the advisors' new firm were covered by the Broker's Protocol, Merrill Lynch sought damages against the advisors in excess of $75,000. *See Merrill Lynch, Pierce, Fenner & Smith Incorporated v.*

*Wallace et al.,* 1:21-cv-01397-ELH (D. Md. June 4, 2021). The case was dismissed without the issuance of a TRO.

36.     In another action in 2021, Merrill Lynch brought claims against several high-producing advisors after the advisors left Merrill Lynch and joined another large investment firm (Wells Fargo). Again, Merrill Lynch's suit targeted a **fifty-year** veteran of the company. The departing team, including four associates, had managed $1.2 billion in client assets, and generated around $6 million in annual revenue. Upon information and belief, Merrill Lynch sought to prevent the team from taking its legally entitled client information as the clients represented a significant revenue stream for Merrill Lynch.

37.     Despite Merrill Lynch's continued agreement to be bound by the Broker Protocol, Merrill Lynch has taken aggressive steps to prevent further loss of financial advisors and clients from the firm, including bringing legal action against advisors who legally invoke the protections of the Broker Protocol.

38.     In a letter dated December 14, 2022, addressed to Philip's counsel, Merrill Lynch explicitly stated that Philip "is prohibited from retaining any client or proprietary information of Merrill, including but not limited to client names, addresses, [and] telephone numbers…." Moreover, Merrill Lynch claims Philip "is not permitted to use or disclose that information to solicit any Merrill clients to transfer their business elsewhere." These Merrill Lynch demands contravene California law. It is clear Merrill Lynch intends to pursue claims against Philip if he solicits clients to join his new firm.

***Plaintiffs Are Not Using Confidential Information***

39.     Plaintiffs have since joined another FINRA registered broker-dealer and Protocol firm and intend to announce their affiliation with the firm. Plaintiffs intend to solely use publicly available information or information based on memory and knowledge from decades in the industry in announcing their affiliation and soliciting

clients.[3] Neither Plaintiff has taken any information, or documents, which are considered under California law to be confidential or proprietary.

40. Plaintiffs are filing, simultaneously with the filing of this action, an arbitration claim against Defendant before FINRA's arbitration division. FINRA's Code of Arbitration Procedure requires parties seeking temporary injunctive relief to do so before a court of competent jurisdiction. Upon entry of such an order by a court, FINRA will schedule an expedited hearing on the request for a permanent injunction.

## FIRST CLAIM FOR RELIEF

### (For Declaratory Judgment as to 18 U.S.C. § 1836)

### (All Plaintiffs against Defendant)

41. Plaintiffs restate and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

42. An actual controversy exists between Plaintiffs and Defendant. Based on the terms of the Employment Agreement, the CTP-SCA, the CTP-RFA, and the December 14, 2022, correspondence from Merrill Lynch, Plaintiffs have good reason to believe Merrill Lynch will pursue litigation and injunctive relief against them under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") if they pursue alternative employment and contact or solicit their clients to join their new firm.

43. Plaintiffs contend that their knowledge and/or possession of client contract information, and their use of that information to contact and solicit clients and announce their affiliation with their new firm: (1) does not constitute a misappropriation of Defendant's trade secrets or violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836; (2) does not constitute a breach of any enforceable provision of

---

[3] Plaintiffs have hired a third-party forensic vendor to erase and reset their electronic devices, including mobile phones and laptops, once used to conduct business for Merrill Lynch. Plaintiffs no longer have access to any Merrill Lynch proprietary or confidential information.

Plaintiffs' agreements with Defendant; (3) does not constitute unfair competition; and (4) does not otherwise give rise to any claim that would entitle Defendant to obtain a temporary restraining order or preliminary or permanent injunctive relief against Plaintiffs.

44. Thus, Plaintiffs seek a declaration from the Court holding that:

   a. Plaintiffs have not misappropriated any of Defendant's protectable trade secrets or violated the Defend Trade Secrets Act;

   b. Plaintiffs have not breached any enforceable provision of their agreements with Defendant and that any provisions of any agreements Defendant may rely on in seeking to prevent Plaintiffs from using any client contact information are invalid and unenforceable;

   c. Defendant has no viable or enforceable claims against Plaintiffs arising out of their departure from Merrill Lynch or their affiliation with their new firm;

   d. Defendant is precluded from withholding from Plaintiffs any compensation owed to them; and

   e. Defendant is not entitled to a temporary restraining order, preliminary injunction, permanent injunction or other injunctive or monetary relief against Plaintiffs related to their transition to a new firm, their announcement to their former clients of their new affiliation, and their solicitation of clients to move their accounts to their new firm.

## SECOND CLAIM FOR RELIEF

**(For Declaratory Judgment as to Employment Agreement)**

**(All Plaintiffs against Defendant)**

45. Plaintiffs restate and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

46. An actual controversy exists between Plaintiffs and Defendant. Resolution of the parties' respective rights and duties by declaration of the Court is necessary, as there is no adequate remedy at law.

47. Plaintiffs contend that the employment agreements they signed with Merrill Lynch are, in whole or in part, illegal, void, and unenforceable as against California public policy. Enforcement of those agreements will constitute, among other things, unfair business practices, illegal restrictions on trade, and unfair competition.

48. Defendant drafted Employment Agreement (Exhibit 1) and required Philip to sign it as part of his employment with Merrill Lynch.

49. The Employment Agreement states, "that [Philip] be enjoined and restrained from using or disclosing any information" learned as part of his employment with Merrill Lynch. See Exhibit 1, section 4. Moreover, Philip is "enjoined and restrained from soliciting any Account whom [he] served or whose name became known to [him] while employed by Merrill Lynch, in any office and in any capacity." *Id*.

50. Employment Agreement includes a non-solicitation provision that bars Philip for one-year after termination of his employment, with no geographical limitation, from:

(a) encouraging or requesting any client to transfer from Merrill Lynch to Philip or to his new employer;

(b) encouraging or requesting any client to open a new account with Philip or with his new employer; or

(c) encouraging or requesting any client to otherwise discontinue its patronage and business relationship with Merrill Lynch. (See Exhibit 1, Section 2).

51. Upon information and belief, Michael also signed a Merrill Lynch employment agreement in a form substantially similar to Exhibit 1. Michael is ostensibly bound by the same restrictive covenants in the Employment Agreement.

52. Thus, Plaintiffs seek a declaration from the Court holding that:

    a. The Employment Agreements signed by Plaintiffs are illegal, unconscionable, void, and unenforceable in their entirety; or alternatively,

    b. Those sections within the Employment Agreements that prohibit Plaintiffs from interactions with, or solicitation of, clients (i.e., Exhibit 1, section 4 and the corresponding provision of Michael's employment agreement) are void and unenforceable.

53. Upon information and belief, Merrill Lynch also has similar unlawful non-solicitation provisions in other employment related agreements that purport to divest advisors of compensation they are owed if the advisors solicit clients after leaving the firm. Plaintiffs similarly seek a declaration that any Merrill Lynch agreements that punish Plaintiffs for legally soliciting their clients to join their new firm are void and unenforceable.

### THIRD CLAIM FOR RELIEF

### (For Declaratory Judgment as to CTP-SCA)

### (Michael against Defendant)

54. Plaintiffs restate and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

55. An actual controversy exists between Michael and Defendant. Resolution of the parties' respective rights and duties by declaration of the Court is necessary, as there is no adequate remedy at law.

56. Michael contends that certain agreements he signed in his employment with Merrill Lynch are, in whole or in part, illegal, void, and unenforceable as against California public policy. Enforcement of those agreements will constitute, among other things, unfair business practices, illegal restrictions on trade, and unfair competition.

57. Defendant drafted the CTP-SCA and required Michael to sign it as part of his employment with Merrill Lynch and planned retirement.

58. The CTP-SCA imposes several restrictive and unenforceable provisions on Michael, including:

    a. "During the Restricted Period, [Michael] must not contact former clients, directly or indirectly (either independently or in coordination with another registered representative, including the Receiving FA/PWA), for the purposes of soliciting them to transfer their accounts from Merrill Lynch, to conduct any securities transactions, or to offer financial advice." See Exhibit 2, page 3.

    b. "During the Restricted Period, [Michael] must not discuss securities transactions (past, present or future) or securities-related matters with former clients either independently or in coordination with another registered representative including the Receiving FA/PWA." See Exhibit 2, page 3.

    c. "During the Restricted Period, [Michael] shall not contact former clients, directly or indirectly (either independently or in coordination with another registered representative, including the Receiving FA/PWA), for the purposes of soliciting them to transfer their accounts from Merrill Lynch, to conduct any securities transactions, or to offer financial advice." See Exhibit 2, page 3.

59. The CTP-SCA further states that for an indefinite period: "[Michael] shall not disclose, copy, use, own, apply for, or otherwise attempt to obtain or use, directly or indirectly… any Confidential Information…." See Exhibit 2, page 4.

60. Thus, Plaintiff seeks a declaration from the Court holding that:

    a. The CTP-SCA is illegal, unconscionable, void, and unenforceable in its entirety; or alternatively,

    b. Those sections within the CTP-SCA that prohibit Michael from interacting with former clients during the "Restricted Period" (i.e., Exhibit 2, page 3) are void and unenforceable; and

      c.    Those sections within the CTP-SCA that prohibit Michael from obtaining or using any Confidential Information (i.e., Exhibit 2, page 4) are void and unenforceable.

61.    Upon information and belief, Merrill Lynch also has similar unlawful non-solicitation provisions in other employment related agreements that purport to divest advisors of compensation they are owed if the advisors solicit clients after leaving the firm. Plaintiffs similarly seek a declaration that any Merrill Lynch agreements that punish Plaintiffs for legally soliciting their clients to join their new firm are void and unenforceable.

## FOURTH CLAIM FOR RELIEF

**(For Declaratory Judgment as to CTP-RFA)**

**(Philip against Defendant)**

62.    Plaintiffs restate and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

63.    An actual controversy exists between Philip and Defendant. Resolution of the parties' respective rights and duties by declaration of the Court is necessary, as there is no adequate remedy at law.

64.    Plaintiff contends that certain agreements he signed in his employment with Merrill Lynch are, in whole or in part, illegal, void, and unenforceable as against California public policy. Enforcement of those agreements will constitute, among other things, unfair business practices, illegal restrictions on trade, and unfair competition.

65.    Defendant drafted the CTP-RFA and required Philip to sign as part of his employment with Merrill Lynch.

66.    The CTP-RFA states, "If the Receiving FA terminates employment with Merrill Lynch, either voluntarily or involuntarily, the Receiving FA/PWA shall not, directly or indirectly, solicit financial services business from the Eligible Households (and accounts therein) for a period of five years from the agreement execution date,

even if the Receiving FA's/PWA's new employer is a signatory to the Protocol for Broker Recruiting (Protocol)." See Exhibit 3, section IIa.

67. The CTP-RFA also improperly prohibits Philip from soliciting clients unless he pays Merrill Lynch a significant sum to take/use confidential information (see Exhibit 3, section IIb), of which Philip is already legally entitled to use under California law.

68. The CTP-RFA also includes a New York choice of law provision that violates California Labor Code § 925.

69. Thus, Plaintiff seeks a declaration from the Court holding that:

    d. The CTP-RFA is illegal, unconscionable, void, and unenforceable in its entirety; or alternatively,

    e. Those sections within the CTP-RFA that prohibit Philip from soliciting financial services business for five years (i.e., Exhibit 3, section IIa) are void and unenforceable;

    f. Those sections within the CTP-RFA requiring that the agreement be interpreted and construed under New York law are void and unenforceable; and

    g. Those sections within the CTP-RFA that prohibit Philip from soliciting clients unless he pays Merrill Lynch a significant sum to take/use confidential information (i.e., Exhibit 3, section IIb) are void and unenforceable.

70. Upon information and belief, Merrill Lynch also has similar unlawful non-solicitation provisions in other employment related agreements that purport to divest advisors of compensation they are owed if the advisors solicit clients after leaving the firm. Plaintiffs similarly seek a declaration that any Merrill Lynch agreements that punish Plaintiffs for legally soliciting their clients to join their new firm are void and unenforceable.

**PRAYER FOR RELIEF**

Plaintiffs therefore pray for relief as follows:

1. For a declaratory judgment, and temporary restraining order and preliminary injunction finding that:

    a. Plaintiffs have not misappropriated any of Defendant's protectable trade secrets or violated the Defend Trade Secrets Act;

    b. Plaintiffs have not breached any enforceable provision of their agreements with Defendant and that any provisions of any agreements Defendant may rely on in seeking to prevent Plaintiffs from announcing to their clients an affiliation with a new firm and soliciting clients, are invalid and unenforceable;

    c. Defendant has no claims against Plaintiffs arising out of their departure from Merrill Lynch;

    d. Defendant is not entitled to a temporary restraining order, preliminary injunction, permanent injunction or other injunctive or monetary relief against Plaintiffs related to their transition to a new firm and their solicitation of clients;

    e. Defendant's Employment Agreement, CTP-SCA, and CTP-RFA are illegal, unconscionable, void, and unenforceable in their entirety; and, alternatively:

        i. Those sections within the Employment Agreements that bar Plaintiffs from interactions with, or solicitation of, clients (i.e., Exhibit 1, section 4) are void and unenforceable;

        ii. Those sections within the CTP-SCA that prohibit Michael from interacting with former clients during the "Restricted Period" (i.e., Exhibit 2, page 3) are void and unenforceable;

       iii. Those sections within the CTP-SCA that prohibit Michael from obtaining or using any Confidential Information (i.e., Exhibit 2, page 4) are void and unenforceable;

       iv. Those sections within the CTP-RFA that prohibit Philip from soliciting financial services business for five years (i.e., Exhibit 3, section IIa) are void and unenforceable;

       v. The New York Choice of Law provision in the CTP-RFA is void and unenforceable;

       vi. Those sections within the CTP-RFA that prohibit Philip from soliciting clients unless he pays Merrill Lynch a significant sum to take/use confidential information (i.e., Exhibit 3, section IIb) are void and unenforceable.

   f. Any Merrill Lynch agreements that punish Plaintiffs for legally soliciting their clients to join their new firm are void and unenforceable;

2. For compensatory damages in an amount according to proof;
3. For prejudgment interest and post-judgment interest at the statutory rate;
4. For attorneys' fees and costs of suit; and
5. For such other relief as the Court deems just and proper.

DATED: January 24, 2023         Submitted by,

SHUSTAK REYNOLDS & PARTNERS, P.C.
ERWIN J. SHUSTAK, ESQ.
KATHERINE S. BOWLES, ESQ.
MAHDI M. IBRAHIM, ESQ.

401 West "A" Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 696-9500
Facsimile: (800) 868-9350

*Attorneys for Plaintiffs*
*Michael Wayne Bradshaw and Philip Scott Bradshaw*